FILED

06/16/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 20, 2019 Session

## STATE OF TENNESSEE v. DEMORRIS MCKENZIE

**Appeal from the Criminal Court for Knox County**
**No. 108180    Bobby R. McGee, Judge**

_____

**No. E2018-02226-CCA-R3-CD**

_____


Defendant, DeMorris McKenzie, was indicted by the Knox County Grand Jury for one count of being a felon in possession of a firearm, one count of first degree premeditated murder, and one count of driving on a revoked license. Following a jury trial, Defendant was convicted as charged on all three counts. Following a sentencing hearing, Defendant was sentenced to life imprisonment for his first degree murder conviction. He was sentenced to serve two years for his firearm conviction and six months for his driving on a revoked license conviction. Those sentences were ordered to run concurrently with his life sentence. In this appeal as of right, Defendant contends that: 1) the trial court erred by allowing a witness to testify as to what she observed in security video footage of the apartment complex where the shooting occurred; 2) the evidence at trial was insufficient to support Defendant's conviction for first degree murder; and 3) Defendant is entitled to relief under the cumulative error doctrine. Having reviewed the entire record and the briefs of the parties, we find no reversible error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JJ., joined.

Richard L. Gaines, Knoxville, Tennessee, for the appellant, Demorris McKenzie.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Charme Allen, District Attorney General; and Takisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Trial*

Barbara Stooksbury, the victim's mother, was staying with the victim and his girlfriend in their apartment at the time of the shooting. She testified that in the early morning hours of February 27, 2016, she woke up to the sound of people arguing. She saw Defendant and the victim in the kitchen, and Defendant was holding a "long gun." Defendant and the victim went outside, and Ms. Stooksbury heard two gunshots. Ms. Stooksbury testified that she, the victim, and the victim's girlfriend had been drinking alcohol earlier that day, and they had each taken one-half of a Xanax. Ms. Stooksbury identified Defendant as the person in the kitchen with the victim in a photo lineup and in court. She testified, "I remember looking up and I looked him right in his eyes." She testified that she did not know Defendant before the incident.

Elizabeth Johnson, Defendant's girlfriend, testified that she knew Defendant as "Crazy," and that he was her "drug dealer." She testified that prior to the shooting, neither she nor the victim had any problems with Defendant. On February 26, 2016, she and the victim bought Xanax from Defendant. After Ms. Stooksbury went to sleep, she and the victim attempted to purchase crack cocaine from Defendant. She met Defendant in the parking lot, and Defendant was driving a "silver champagne" colored Buick sedan. Ms. Johnson gave Defendant $15 in exchange for crack cocaine and then returned to her apartment. She testified that drugs she bought from Defendant were "fake" and that she and the victim were unable to "get high" on the crack cocaine. Ms. Johnson contacted Defendant to return to her apartment. When Defendant arrived, the victim went outside to talk to Defendant. Ms. Johnson watched from the window. Defendant and the victim entered the apartment, and Ms. Johnson saw that Defendant had a "big-[ ] gun." Defendant gave the victim more drugs, and they were also fake. Defendant then gave the victim back his $15.

Defendant and the victim walked back outside. Ms. Johnson testified, "[n]ot five minutes after that, I hear the first gunshot and I take off running out the door." Ms. Johnson hid between two cars. She heard the victim say, "why'd you do that, man? I'm going to die." She then saw Defendant walk around his vehicle to the victim and shoot him again. Defendant then got into his car and left. Ms. Johnson called 911 and attempted to give the victim CPR. She testified that the victim "had a hole in his neck and he was bleeding from his stomach."

Ms. Johnson told police that "a guy named Crazy" had shot the victim. She viewed a photo lineup at the police station and identified Defendant as the person who shot the victim. Ms. Johnson testified that her apartment was on the first floor of their

building, and there was a culvert between the building and the parking lot. She testified that she had to walk down five stairs and up a short flight of stairs to get to the parking lot from her apartment. On cross-examination, Ms. Johnson admitted that she was "an addict." She testified that she did not drink alcohol, but that she "smoke[d] marijuana every day." She testified that she was "clear-headed" on the night of the shooting. Ms. Johnson testified that she did not see the victim drink alcohol that day. She testified that Ms. Stooksbury drank "[a] lot" of alcohol that day. Ms. Johnson testified that she had "[n]o doubt" that Defendant is the person who killed the victim.

Karen Smith, the property manager at Ridgebrook Apartments, where the victim and Ms. Johnson lived, provided police with security video of the apartment complex. Defense counsel objected to Ms. Smith's testimony about what she observed in the video, arguing that the "video speaks for itself." The trial court initially ruled that the "video does speak for itself." The trial court ruled, "[Ms. Smith] can testify as to what she experienced herself, what she actually saw herself, but the video would be the best evidence of the video." Ms. Smith confirmed the accuracy of the time stamp on the video and identified the building locations within the apartment complex. She testified that the video showed "one person [ ] going to a car" and "two other people coming up to talk to each other." Defense counsel again objected, arguing that the "video speaks for itself" and that Ms. Smith did not observe the events shown in the video as they happened. Defense counsel objected to Ms. Smith's "interpretations of the video." The trial court ruled that Ms. Smith could "at least describe which – where in the frame she's looking that she believes is – was an event that occurred that she understands – or has some understanding of what it was." The trial court also ruled that Ms. Smith could not "interpret the video for the jury. They must make their own interpretation."

As to what she observed in the video, Ms. Smith testified that the video showed a car with its lights on parked outside the victim's apartment building and two males talking to each other. She testified that the video showed what looked like "a young man here falling down[.]" She testified, "I see [Defendant] moving around, walking around." Defense counsel again objected, stating "there's no foundation for that either." The trial court ruled, "Well, she's testifying from her – as a – it's her knowledge that it was [Defendant]. You can certainly cross her on that issue." Ms. Smith testified that after the shooting, she saw Defendant's vehicle stop "at a building where his children['s] baby mother lived[.]" She testified that Defendant's girlfriend and Defendant's "baby mama" were two different people, but that both women lived in the apartment complex. Ms. Smith testified that Defendant "stopped there for a moment and looks like he got out." She testified, "then he left out." She also testified that the video showed "[s]everal residents" check on the victim in the parking lot.

- 3 -

Ms. Smith testified that as the property manager of the apartments, she knew "the day-to-day aspect of what's going on on the property." Ms. Smith testified that she was not familiar with Defendant, his girlfriend, or his "baby mama" before the incident. She testified that she "didn't know anything until after."

On cross-examination, defense counsel asked Ms. Smith, "Do you recall when the two figures are discussing things around the car?" The prosecutor interjected, "I just want to make sure I'm clear." Defense counsel stated, "I have to fight fire with fire, since I've already objected and it hasn't been sustained fully." The prosecutor responded, "So are we now saying that it is okay for this witness to testify as to what she saw on the video?" The trial court ruled that defense counsel could cross-examine Ms. Smith about what she saw on the video, "but then it's fair game for the State, too." The trial court noted that Ms. Smith "was commencing a narrative that I stopped." Defense counsel then ended his cross-examination of Ms. Smith.

Detective Brandon Wardlaw, of the Knoxville Police Department, investigated the shooting. Detective Wardlaw was able to identify Defendant as the person Ms. Johnson knew as "Crazy." He testified that Ms. Johnson "did not seem she was under the influence of anything when I spoke with her." Detective Wardlaw testified that police were unable to locate Defendant. Defendant turned himself into police about one month after the incident.

Detective Wardlaw showed photo lineups to Ms. Johnson and Ms. Stooksbury. He testified that a box on both photo identification forms was mistakenly checked. The checked box indicated that there was no positive identification. Detective Wardlaw explained that the police department had recently implemented a new photo lineup system, and it was his first time using the new system.

Dr. Amy Hawes, an assistant medical examiner and forensic pathologist, performed an autopsy on the victim. She testified that the victim sustained a gunshot wound to his abdomen. A bullet entered just below the victim's belly button and did not exit his body. The bullet hit the victim's aorta and spine. Dr. Hawes testified that the injury to the victim's spine would "have likely incapacitated him." She testified that the aortic injury would have caused rapid bleeding and was a fatal injury. The victim also sustained a gunshot wound to his upper back. The bullet exited the left side of the victim's neck. Dr. Hawes testified that the victim suffered a third gunshot wound that was a "complex wound," meaning that the bullet entered the body, exited, reentered the body, and exited again. Bullets fired from a high-velocity firearm, such as an AK rifle or an SKS rifle, can cause a complex wound. Dr. Hawes testified that the victim's wounds were consistent with him having been shot in the abdomen, falling to the ground, and then being shot in the back. Dr. Hawes testified that a toxicology report indicated that the

victim had a blood alcohol concentration of .09 percent, and the victim had used cocaine recently prior to his death. Dr. Hawes concluded that the cause of the victim's death was multiple gunshot wounds, and the manner of his death was homicide.

The parties stipulated that Defendant had a prior felony conviction for a drug offense and that his license was revoked on the day of the offense.

Defendant did not testify or present any other evidence.

*Analysis*

*Ms. Smith's testimony regarding apartment security video*

Defendant first contends that the trial court erred in admitting Ms. Smith's "interpretations" of the security video footage. Defendant contends that Ms. Smith's testimony violated a number of rules of the Tennessee Rules of Evidence, including Rules 602, 701, 401, and 403. Specifically, Defendant asserts that Ms. Smith had no personal knowledge of the people and events depicted in the video. The State responds that the trial court properly allowed Ms. Smith to testify as to what she observed in the video and that any error that resulted from Ms. Smith's identification of Defendant as the shooter was harmless.

We begin by observing that a witness must have the requisite personal knowledge to testify. Tennessee Rule of Evidence 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." The "[e]vidence to prove personal knowledge may, but need not, consist of the witness's own testimony." Tenn. R. Evid. 602. "The personal knowledge rule of Rule 602 provides that . . . a witness is not competent to testify about facts unless the witness personally perceived those facts by use of the witness's five senses ." Neil P. Cohen, et al., Tennessee Law of Evidence § 602.1 at 2 & 3.

The trial court must determine "whether a witness had a sufficient opportunity to perceive the subject matter about which he or she is testifying." *State v. Land*, 34 S.W.3d 516, 529 (Tenn. Crim. App. 2000). A witness's personal knowledge "may be inferred from the statements themselves and the surrounding facts and circumstances." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). A witness's testimony "may not be based on mere speculation," but Rule 602 "does not require absolute certainty." *Land*, 34 S.W.3d at 529 (internal quotation marks omitted). "[T]he party offering the testimony must introduce evidence sufficient to support a jury finding that the witness had personal knowledge of the matter." *Id*.

Lay witness testimony "in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of the fact in issue." Tenn. R. Evid. 701. A witness may not testify about the identity of an offender if there was no showing that the witness had personal knowledge of the offender's identity. *Land*, 34 S.W.3d at 530. In order to introduce a lay witness's testimony identifying a defendant on a video, "the trial court at least should be reasonably satisfied that because of the either obscured or altered appearance of the defendant, the lay witness is more likely to accurately identify the defendant than is the fact finder." *State v. Malcolm Benson*, No. W2003-02211-CCA-R3-CD, 2004 WL 1813222, at *4 (Tenn. Crim. App. Aug. 12, 2004) (internal quotation marks omitted), *perm. app. denied* (Tenn. Dec. 20, 2004).

The trial court has the discretion to determine whether a witness is competent to testify under Rule 602 or Rule 701. *State v. Carruthers*, 35 S.W.3d 516, 576 (Tenn. 2000); *State v. McCloud*, 310 S.W.3d 851, 864-65 (Tenn. Crim. App. 2009). The trial court's determination will not be disturbed absent an abuse of discretion. *Carruthers*, 35 S.W.3d at 376.

The State concedes that it was error for Ms. Smith to identify Defendant as the shooter in the video, but the State contends that the error was harmless. Ms. Smith testified that she did not know Defendant before the incident and did not learn about his relationships with other tenants in the apartment complex until after the incident. Because the evidence did not establish that Ms. Smith had personal knowledge of Defendant's identity, the trial court abused its discretion by allowing Ms. Smith to identify Defendant in the video.

We agree with the State, however, that Ms. Smith's identification of Defendant in the video was harmless. Ms. Johnson witnessed the shooting and positively identified Defendant as the shooter. Ms. Johnson knew Defendant prior to the incident. She testified that Defendant and the victim walked outside together, and Defendant had a "big-[ ] gun." Moments later, she heard a gunshot. Ms. Johnson ran outside and saw Defendant walk around his vehicle, approach the victim, and shoot the victim. Ms. Stooksbury identified Defendant as the person she saw holding a "long gun" and arguing with the victim in the kitchen shortly before the shooting. Additionally, the jury viewed the video at trial and had the opportunity to determine whether the individual in the video was Defendant. Presented with all of this evidence, the jury found that Defendant was the shooter. Defendant has not established that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008); *see also* Tenn. R. App. P. 36(b).

The State argues that, other than Ms. Smith's identification of Defendant in the video, Ms. Smith's testimony regarding her observations of the video were properly admitted. Ms. Smith's observations included that the video showed two males talking to each other in the parking lot, "a young man [ ] falling down[,]" a vehicle driving away, and people going to check on the individual who fell to the ground. We agree with the State that these observations are inferences that were rationally based on Ms. Smith's perception of the video and therefore admissible. *See Land*, 34 S.W.3d at 529; Tenn R. Evid. 701.

In his statement of the issues, Defendant contends that Ms. Smith's testimony regarding her observations of the video should have been excluded under Tennessee Rules of Evidence 401 and 403. To be admissible, all evidence must be relevant to an issue the jury must decide. *State v. Thomas*, 158 S.W.3d 361, 394 (Tenn. 2005) (citations omitted); *State v. Vann*, 976 S.W.2d 93, 102 (Tenn. 1998). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978).

The State responds that Defendant has waived this issue by failing to object on the basis of relevance at trial. *See State v. Adler*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) ("It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal."). However, the record reflects that one of defense counsel's multiple objections during Ms. Smith's testimony was on the basis of relevance. His objection was to Ms. Smith's testimony regarding Defendant's relationship to his girlfriend and his "baby mama," who both resided in the apartment complex. Nevertheless, Defendant's brief on appeal contains only a conclusory statement that Ms. Smith's testimony violated Rules 401 and 403. Defendant does not include any argument or citation to relevant authority to support his claim. Therefore, we conclude that the issue is waived. Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

Finally, Defendant asserts that the trial court's "unclear rulings" and the exchange between defense counsel and the trial court during defense counsel's cross-examination of Ms. Smith impeded his cross-examination of her. The record shows that following

defense counsel's objection to Ms. Smith's testimony on direct examination that the video showed Defendant walking around, the trial court instructed defense counsel that he could "certainly cross her on that issue." On cross-examination, defense counsel asked Ms. Smith if she "recall[ed] when two figures [were] discussing things around the car." The trial court ruled that defense counsel's questioning of Ms. Smith regarding her interpretations of what she viewed on the video would open the door to additional questioning by the State. *See Land*, 34 S.W.3d at 530 (when a defendant opens a door to a subject during cross-examination, the State may question the witness about the same subject on redirect examination.). Defense counsel ended his cross-examination of Ms. Smith. This ruling by the trial court was not an improper limitation on defense counsel's cross-examination. Defense counsel was not prevented from cross-examining Ms. Smith about her knowledge of the events in the video or the basis for her identification of Defendant in the video.

*Sufficiency of the evidence*

Defendant contends that the evidence was insufficient to support his conviction for first degree premeditated murder. Defendant argues that the evidence was insufficient to prove his identity as the perpetrator of the murder of the victim. He asserts that there was no physical evidence to connect him to the murder and that he was convicted based primarily upon the testimony of Ms. Johnson, who Defendant contends, is not a credible witness because her testimony was "contradictory and unreliable." The State responds that the evidence at trial was sufficient to establish Defendant as the perpetrator.

The standard for an appellate court when reviewing a challenge to the sufficiency of the evidence is "whether, considering the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002); *see also* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the burden shifts to the defendant upon conviction to show why the evidence is insufficient to support the verdict. *See State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003); *State v. Carruthers*, 35 S.W.3d at 557-58; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000); *see also Carruthers*, 35 S.W.3d at 558; *Hall*, 8 S.W.3d at 599.

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d

776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

Defendant was convicted of premeditated first degree murder. First degree murder is "a premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Defendant does not appeal whether the evidence established that the murder was premeditated, but rather whether the evidence is sufficient to prove his identity as the murderer. The identity of the perpetrator is an essential element of any crime. *State v. Rice*, 184 S.W.3d at 662 (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. *State v. Cribbs*, 967 S.W.2d 773, 779 (Tenn. 1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. *Thompson*, 519 S.W.2d at 793. The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005) (citing *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

Defendant asserts that Ms. Johnson's testimony was not credible. He argues that Ms. Johnson could not have sufficiently identified Defendant as the shooter because of her vantage point "between two cars[,]" because it was dark outside, and because her "degree of attention [wa]s particularly clouded" due to her drug use. Defendant also argues that Ms. Johnson gave "no specific identifying features that could prove [Defendant] to be Crazy beyond a reasonable doubt." However, at trial, defense counsel extensively cross-examined Ms. Johnson about her vision, her drug use, the location of the parking lot relative to her apartment, and her ability to see the shooter. A witness's credibility is resolved solely by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court may not reweigh the jury's credibility determination on appeal. *Id.*

Although Ms. Johnson only knew Defendant by the name "Crazy," she was familiar with Defendant and routinely purchased drugs from him. Ms. Johnson identified Defendant as the person who sold drugs to her on the night of the offense. She testified that after selling fake drugs to her, Defendant returned to her apartment and stood in the kitchen talking to the victim. Defendant had a "big-[ ] gun." Defendant and the victim walked outside together, and Ms. Johnson heard a gunshot. She immediately ran to the parking lot and heard the victim say, "why'd you do that, man? I'm going to die." Ms. Johnson then saw Defendant walk around his car and shoot the victim. Ms. Johnson identified Defendant in a photo lineup and at trial as the person who shot the victim. Ms. Stooksbury also identified Defendant in a photo lineup and at trial as the person holding a "long gun" and arguing with the victim in the apartment shortly before the shooting. By its verdict, the jury accredited Ms. Johnson's testimony, and this court will not reweigh the jury's credibility determinations.

Defendant also argues that the evidence was insufficient to support his conviction because the State did not present any forensic evidence, including DNA or fingerprint evidence, linking him to the scene of the shooting and because the State did not establish what kind of gun was used in the offense. However, a conviction may be based on direct or circumstantial evidence, and the standard of review is the same. *Dorantes*, 331 S.W.3d at 379. The proof showed that the victim suffered a gunshot wound to his abdomen and a complex gunshot wound to his shoulder and neck, which Dr. Hawes testified can be caused by a high-velocity weapon, such as an AK rifle or an SKS rifle. Dr. Hawes also testified that the victim's wounds were consistent with him having been shot in the abdomen, falling to the ground, and then being shot in the back. From this evidence, as well as the testimony of two witnesses who 1) saw Defendant with the victim immediately prior to the shooting, 2) saw Defendant holding a long gun, and 3) heard two gunshots, the jury could reasonably infer that Defendant shot the victim. We conclude that the evidence was sufficient to sustain Defendant's conviction. Defendant is not entitled to relief on this issue.

We note that Defendant asserts in his brief that Ms. Johnson "became precariously close to being stricken as an incompetent witness as a matter of law." However, Defendant failed to make an objection at trial as to Ms. Johnson's incompetence as a witness. In his amended motion for new trial, Defendant asserted that Ms. Johnson's testimony was incompetent and should have been stricken because she "readily admitted to a plethora of intoxicants she had contemporaneously ingested." In his brief on appeal, however, Defendant did not include Ms. Johnson's incompetency as a witness in his statement of the issues. He made only two buried references to the witness's competence in his brief. One was the above quote in the sufficiency of the evidence section, and the

other is that Ms. Johnson's "obvious incompetency" should entitle him to cumulative error relief.

"Every person is presumed competent to be a witness except as otherwise provided in [the rules of evidence] or by statute." Tenn. R. Evid. 601. "So long as a witness is of sufficient capacity to understand the obligation of the oath or affirmation, and some rule or statute does not provide otherwise, the witness is competent." *State v. Caughron*, 855 S.W.2d 526, 538 (Tenn. 1993). A defendant must object to an incompetent witness when the witness is first offered. *Bowman v. State*, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980). Defendant did not challenge Ms. Johnson's competency to testify at any time prior to or during the trial. Accordingly, we conclude that any challenge to Ms. Johnson's competency is waived.

*Cumulative error*

Defendant contends that he is entitled to relief under the cumulative error doctrine. The State responds that Defendant has waived the issue by failing to include it in his motion for new trial or the statement of the issues section of his appellate brief. Additionally, the State argues that Defendant has failed to establish multiple errors in the trial court.

The cumulative error doctrine applies when multiple errors were committed during trial, each of which alone would have constituted harmless error, but in the aggregate have a cumulative effect on the proceedings so great the defendant's right to a fair trial can only be preserved through reversal. *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Circumstances warranting reversal of a conviction under the cumulative error doctrine "remain rare." *Id*. In this case, we have discerned only one error by the trial court, which we conclude was harmless. "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." *Hester*, 324 S.W.3d at 77. The cumulative error doctrine does not entitle Defendant to relief.

CONCLUSION

After a thorough review of the record and the applicable law, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE

- 11 -